A. Clifford Edwards
Triel D. Culver
A. Christopher Edwards
John W. Edwards
EDWARDS & CULVER
1648 Poly Drive, Suite 206
Billings, Montana 59102
Telephone: (406) 256-8155
Facsimile: (406) 256-8159
triel@edwardslawfirm.org
chris@edwardslawfirm.org
john.edwards@edwardslawfirm.org

Jeffrey Kaliel, *pro hac vice*
Sophia Gold, *pro hac vice* pending
KALIEL PLLC
1875 Connecticut Avenue NW
10th Floor
Washington, DC 20009
(202) 300-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

*Attorneys for Plaintiffs*

## MONTANA THIRTEENTH JUDICIAL DISTRICT COURT
## YELLOWSTONE COUNTY, MONTANA

| | |
|---|---|
| BRANDY MORRIS and BRENDA GRAY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FIRST INTERSTATE BANK,<br><br>Defendant. | Cause No.  DV-20-528<br><br>Judge: Michael G. Moses<br><br>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Brandy Morris and Brenda Gray, by counsel, and for their Amended Class Action Complaint against the Defendant, they allege as follows:

## NATURE OF THE ACTION

1.     This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant, First Interstate Bank ("First Interstate"), arising from bank's routine practice of assessing and collecting "overdraft fees" ("OD Fees") on accounts that were never actually overdrawn.

2.     This practice breaches contract promises made in First Interstate's adhesion contracts.

3.     First Interstate's customers have been injured by First Interstate's improper practices to the tune of millions of dollars bilked from their accounts in violation of their agreements with First Interstate.

4.     On behalf of themselves and the Class, Plaintiffs seek damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

## PARTIES AND JURISDICTION

5.     Plaintiff Morris resides in Billings, Montana, and holds a First Interstate Bank checking account.

6.     Plaintiff Gray resides in Bigfork, Montana, and holds a First Interstate Bank checking account.

7.     Defendant First Interstate Bank is a Montana Bank engaged in the business of providing retail banking services to consumers, including Plaintiffs and members of the putative

Class. First Interstate has its headquarters in Billings, MT.  Its principal place of business is 401 North 31st Street, Billings, Montana 59101.

8.      This court has jurisdiction over Defendant pursuant to Rule 4, M.R.Civ.P., because First Interstate is a Montana bank subject to personal jurisdiction here, regularly conducts business here, and a substantial part of the conduct giving rise to the claims asserted herein occurred in Montana.

9.      Venue is proper here under MCA § 25-2-118 because Defendant resides in this County.

## FACTUAL ALLEGATIONS

**I.      FIRST INTERSTATE CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT**

### A.      Overview of Claim

10.     Plaintiffs have checking accounts with First Interstate.

11.     First Interstate issues debit cards to its checking account customers, including Plaintiffs, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

12.     Pursuant to its standard account agreement, First Interstate charges fees (currently in the amount of $35) for debit card transactions that purportedly result in an overdraft.

13.     Plaintiffs bring this cause of action challenging First Interstate's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

14.     Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, First Interstate immediately reduces accountholders' checking accounts for the amount of the purchase, sets aside funds in a checking

account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds to cover these transactions because First Interstate has already sequestered these funds for payment.

15.     However, First Interstate still assesses crippling OD Fees on many of these transactions, and mispresents its practices in its account documents.

16.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, First Interstate later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

17.     First Interstate maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, First Interstate sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

18.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which

may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

19.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

20.     Still, despite keeping those held funds off-limits for other transactions, FIRST INTERSTATE improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

21.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the

customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

22.     There is no justification for these practices, other than to maximize First Interstate's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But First Interstate is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But First Interstate was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

23.     Besides being unfair and unjust, these practices breach contract promises made in First Interstate's adhesion contracts—contracts which fail to inform accountholders about the true nature of First Interstate's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

24.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that First Interstate will only charge OD Fees on transactions that have insufficient funds to "cover" that debit card transaction.

25.     In short, First Interstate is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.      Mechanics of a Debit Card Transaction**

26.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from First Interstate. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to First Interstate, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

27.     At this step, if the transaction is approved, First Interstate immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

28.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

29.     First Interstate (like all credit unions and banks) decides whether to "pay" debit card transactions at authorization.  After that, First Interstate is obligated to pay the transaction no matter what.  For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point—when First Interstate may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

30.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### C.     <u>First Interstate Account Contract</u>

31.     Plaintiffs have a First Interstate checking account, which is governed by First Interstate's standardized "Terms and Conditions of Your Account" document ("Deposit Agreement"), Ex. A.

32.     The Deposit Agreement expressly promises the available balance is immediately reduced for holds, including those placed immediately on debit card transactions; and confirms that "non-sufficient funds items" are only those items that "overdraw[] your account":

> **A temporary debit authorization hold affects your account balance -** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Deposit Agreement, Ex. A at 3.

33.     The Deposit Agreement also provides that First Interstate makes overdraft determinations when it decides to "honor" transactions, which is the moment of authorization for debit card transactions:

**Overdrafts** - You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the available account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts.

Deposit Agreement, Ex. A at 4.

34.     The Deposit Agreement also expressly states:

**DEBIT CARD HOLDS** – Hold is placed automatically on the account for the amount of the debit card transaction.  The hold remains on those funds until the merchant presents the transaction for payment.

*Id.*, at 5.

35.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet First Interstate assesses OD Fees on them anyway.

36.     APPSN transactions are always *initiated* at the time the customer swipes the debit card when there are sufficient available funds in the account.

37.     In fact, First Interstate actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

38.     All the above representations and contractual promises are untrue. In fact, First Interstate charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that First Interstate may impose OD Fees on any APPSN Transactions.

39.     The Deposit Agreement misconstrues First Interstates' true debit card processing and overdraft practices.

40.     First, and most fundamentally, First Interstate charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that First Interstate will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

41.     First Interstate assesses OD Fees on APPSN Transactions that **_do_** have sufficient funds available to cover them throughout their lifecycle.

42.     First Interstate's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between First Interstate's actual practice and the contract causes accountholders like the Plaintiffs to incur more OD Fees than they should.

43.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

44.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what First Interstate does when it re-debits the account during a secret batching posting process.

45.     In reality, First Interstate's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

46.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, First Interstate cannot then

charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

47.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, First Interstate does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, First Interstate releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

48.     This secret step allows First Interstate to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which First Interstate specifically set aside money to pay them.

49.     This discrepancy between First Interstate's actual practices and the contract causes accountholders to incur more OD Fees than they should.

50.     In sum, there is a huge gap between First Interstate's practices as described in the account documents and First Interstate's practices in reality.

**D.**     **First Interstate Abuses Contractual Discretion**

51.     First Interstate's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, First Interstate exploits contractual discretion to the detriment of accountholders when it uses these policies.

52.     The terms "hold" or "debit card hold" are interpreted by First Interstate in a surprising, counterintuitive way. First Interstate uses its discretion to define these terms in a manner contrary to any reasonable, common sense understanding of that term.

11

53.     Moreover, First Interstate uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

54.     First Interstate uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

### E.     Reasonable Accountholders Understand Debit Card Transactions are Debited Immediately

55.     The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

56.     First Interstate was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

57.     First Interstate knows that many accountholders prefer debit cards for these very reasons. Research indicates that accountholders prefer debit cards as a budgeting device because they don't allow debt like credit cards do, and because the money comes directly out of a checking account.

58.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About*

*Using a Debit Card?*, ConsumerAction (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card.

59.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, ConsumerAction, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited August 29, 2019).

60.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

61.     Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

62.     First Interstate was aware of an accountholder perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

**F.**     **Plaintiffs' Debit Card Transactions**

63. As examples, on March 6, 2017, March 7, 2017, and April 10, 2017 Plaintiff Morris was assessed OD Fees for debit card transactions that settled on those days, despite the fact that positive funds were deducted immediately, prior to those days, for the transaction on which Plaintiff was assessed OD Fees.

64. Also as examples, on February 7, 2020 and June 22, 2020 Plaintiff Gray was assessed OD Fees for debit card transactions that settled on those days, despite the fact that positive funds were deducted immediately, prior to those days, for the transactions on which Plaintiff was assessed OD Fees.

## CLASS ACTION ALLEGATIONS

65. Plaintiffs brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Montana Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

66. Description of the Class:  Plaintiffs bring this class action on behalf of herself and a class of persons ("the Class") defined as follows:

> All citizens of the state of Montana who, during the applicable statute of limitations, were charged OD Fees on APPSN Transactions (the "Class").

67. Excluded from the Class are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

68. The time period for each of the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as First Interstate remedies the conduct complained of herein.

69.     <u>Numerosity</u>:  The members of the proposed Class are so numerous that individual joinder of all members is impracticable.  The exact number and identities of the members of the proposed Class are unknown at this time and can be ascertained only through appropriate discovery.  Plaintiffs estimate the number of members in each Class to be in the thousands.

70.     <u>Common Questions of Law and Fact Predominate</u>:  There are many questions of law and fact common to Plaintiffs and the Class, and those questions substantially predominate over any questions that may affect individual Class members.  Common questions of law and fact include whether:

A.      Whether First Interstate charged OD Fees on items that did not overdraw checking accounts;

B.      Whether First Interstate breached its contract by charging OD Fees on items that did not overdraw checking accounts;

C.      Whether First Interstate breached the covenant of good faith and faith dealing by charging OD Fees on items that did not overdraw checking accounts;

D.      Whether First Interstate developed and engaged in unlawful practices that mischaracterized or concealed its true OD Fee practices;

E.      The proper method or methods by which to measure damages; and

F.      The declaratory and injunctive relief to which the Class are entitled.

71.     <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have been similarly affected by the actions of Defendant.

72.     <u>Adequacy of Representation</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have retained counsel with substantial experience in prosecuting complex and consumer class action litigation.  Plaintiffs and their counsel are

15

committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.

73.     <u>Superiority of Class Action</u>:  Plaintiffs and the members of the Class suffered, and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class is impractical.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the Class members.

74.     <u>Risk of Inconsistent or Varying Adjudication</u>:  Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of:  (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for First Interstate as the party opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

75.     <u>Action Generally Applicable to Class as a Whole</u>:  First Interstate, as the party opposing the Class, has acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## FIRST CLAIM FOR RELIEF
### Breach of Contract, Including the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiffs and the Class)

76.    Plaintiffs incorporate by reference the preceding paragraphs.

77.    Plaintiffs and First Interstate have contracted for banking services, as embodied in First Interstate's account documents and related documentation.

78.    All contracts entered by Plaintiffs and the Class are identical or substantively identical because First Interstate's form contracts were used uniformly.

79.    First Interstate has breached the express terms of its own agreements as described herein when it assesses OD Fees on items that did not overdraw checking accounts.

80.    First Interstate has breached its contracts with Plaintiffs and the Classes through its overdraft policies and practices alleged herein.

81.    Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them under the contracts.

82.    Plaintiffs and members of the Class have sustained damages as a result of Defendant's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

83.    Plaintiffs and members of the Class have no adequate remedy at law.

## COUNT II
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of Plaintiffs and the Class)

84.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

85.     Defendant's Deposit Agreement is a contract of adhesion.

86.     Under the law of the state of Montana, good faith is an element of every contract. All contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

87.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

88.     A special relationship existed between Plaintiffs/Class and First Interstate because, (1) the parties were in inherently unequal bargaining positions with First Interstate occupying the superior bargaining position, (2) the motivation for Plaintiffs/Class entering into the contract was a consumer motivation, i.e., to make payments, secure peace of mind, security, and future protection of the deposit funds, (3) ordinary contract damages are not adequate because they do not require First Interstate to account for its actions and they do not make Plaintiffs and the Class whole since they were exposed to ongoing emotional distress during the time it charged unauthorized fees, (4) Plaintiffs and the Class are especially vulnerable because they have, by necessity, placed trust in First Interstate to fairly follow its banking policies and, (5) at all times, First Interstate knew Plaintiffs and the Class were unsophisticated and in a vulnerable position

because First Interstate was the author of the boilerplate Deposit Agreement and controlled the banking practices.

89.     First Interstate abused the discretion it granted to itself when it assessed OD Fees on items that did not overdraw checking accounts.

90.     In these and other ways, First Interstate violated the covenant of good faith and fair dealing.

91.     First Interstate willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing revenue from Plaintiffs and other members of the Class.

92.     Each of First Interstate's actions was done in bad faith and was arbitrary and capricious.

93.     First Interstate's misconduct constitutes fraud and/or malice as defined by Montana law, MCA § 27-1-221, and entitling Plaintiffs and the Class an award of punitive damages.

94.     Plaintiffs and members of the putative Class have sustained damages as a result of each of First Interstate's breaches of the covenant of good faith and fair dealing.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs on their own behalf and on behalf of the Class respectfully request that the Court:

(a)     Certify this case as a class action pursuant to Rule 23, appointing Plaintiffs as class representative and appointing counsel for Plaintiffs as lead counsel for the Class;

(b)     Award Plaintiffs and the Class actual, incidental, statutory, and consequential damages in an amount to be proven at trial, including any and all compensatory damages, punitive damages under MCA § 27-1-220, restitution, any applicable

penalties and interest, authorized attorneys' fees, interest, and costs, and any further relief as the Court deems just equitable, and proper;

(c)     Declare First Interstate's practices outlined herein to be unlawful;

(d)     Enjoin First Interstate from engaging in the practices outlined herein;

(e)     Compelling disgorgement of the ill-gotten gains derived from First Interstate's misconduct;

(f)     Grant Plaintiffs and the Class a trial by jury; and

(g)     Awarding such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

DATED this 3rd day of November, 2020.

EDWARDS & CULVER

By: _____
        A. Clifford Edwards
        Triel D. Culver
        A. Christopher Edwards
        John W. Edwards
        Attorneys for Plaintiffs

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 3rd day of November, 2020, that a copy of the foregoing document,

*Amended Complaint and Demand for Jury Trial*, was served electronically and via U.S. Mail,

postage prepaid, upon the following:

> Mark D. Parker
> PARKER, HEITZ & COSGROVE, PLLC
> 401 North 31st Street, Suite 805
> P.O. Box 7212
> Billings, MT  59103-7212
> Email: markdparker@parker-law.com
> *Attorneys for Defendant*
>
> Stuart M. Richter
> Andrew J. Demko
> KATTEN MUCHIN ROSENMAN
> 2029 Century Park East, Suite 2600
> Los Angeles, CA 90067-3012
> Email: stuart.richter@katten.com
> Email: andrew.demko@katten.com
> *Attorneys pro hac vice for Defendant*

# Your
# Deposit
# Account

Privacy
Terms and Conditions
Electronic Transfers
Funds Availability

EXHIBIT A

## TABLE OF CONTENTS

|  | Page |
|---|---|
|  | next page |
| PRIVACY | 3 |
| TERMS AND CONDITIONS OF YOUR ACCOUNT | 3 |
| Important Information About Procedures for Opening a New Account | 3 |
| Agreement | 3 |
| Liability | 3 |
| Deposits | 3 |
| Withdrawals | 3 |
| Ownership of Account and Beneficiary Designation | 4 |
| Rights At Death | 4 |
| Business, Organization and Association Accounts | 4 |
| Stop Payments | 4 |
| Transfer Limitations | 4 |
| Amendments and Termination | 4 |
| Notices | 4 |
| Statements | 4 |
| Account Transfer | 5 |
| Direct Deposits | 5 |
| Setoff and Security Interest | 5 |
| Restrictive Legends or Endorsements | 5 |
| Payment Order of Items | 5 |
| Check Processing | 5 |
| Check Cashing | 5 |
| Debit Card Holds | 5 |
| Facsimile Signatures | 5 |
| Pledges | 5 |
| Agents and Powers of Attorney | 5 |
| Stale-Dated Checks | 5 |
| FDIC Insurance | 5 |
| Endorsements | 5 |
| Unclaimed Property | 6 |
| Death or Incompetence | 6 |
| UTMA Accounts (For Consumer Accounts) | 6 |
| Fiduciary Accounts | 6 |
| IOLTA Accounts | 6 |
| Cash Transaction Reporting | 6 |
| Backup Withholding/TIN Certification | 6 |
| Credit Verification | 6 |
| Lost, Destroyed, or Stolen Certified, Cashier's, or Teller's Checks | 6 |
| Changing Account Products | 6 |
| Transactions by Mail | 6 |
| Legal Actions Affecting Your Account | 6 |
| Check Storage and Copies | 6 |
| Security | 6 |
| Truncation, Substitute Checks, and Other Check Images | 7 |
| Remotely Created Checks | 7 |
| Unlawful Internet Gambling Notice | 7 |
| Telephonic Instructions | 7 |
| Monitoring and Recording Telephone Calls and Consent to Receive Communications | 7 |
| Claim of Loss | 7 |
| Early Withdrawal Penalties | 7 |
| Address or Name Changes | 7 |
| Resolving Account Disputes | 7 |
| Waiver of Notices | 7 |
| Funds Transfers | 7 |
| Wire Transfer Agreement and Disclosure | 8 |
| NOTICE OF NEGATIVE INFORMATION | 9 |
| ELECTRONIC FUND TRANSFERS YOUR RIGHTS AND RESPONSIBILITIES | 9 |
| YOUR ABILITY TO WITHDRAW FUNDS | 11 |

| **FACTS** | **WHAT DOES FIRST INTERSTATE BANK DO WITH YOUR PERSONAL INFORMATION?** |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>• Social Security number          • Payment history<br>• Income                                   • Credit scores<br>• Account balances                    • Account transactions<br><br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons First Interstate Bank chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does First Interstate Bank share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes -** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes -** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes -** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes -** information about your creditworthiness | No | We don't share |
| **For nonaffiliates to market to you** | No | We don't share |

| **Questions?** | Call toll-free 855-342-3400 or go to www.firstinterstatebank.com |
|---|---|

Privacy Model Disclosure
©2010 Wolters Kluwer Financial Services, Inc.
All rights reserved.

2016 7/3215 200881408 Custom

PRIV-MODEL 8/1/2010

**Page 2**

## What We Do

| | |
|---|---|
| **How does First Interstate Bank protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| **How does First Interstate Bank collect my personal information?** | We collect your personal information, for example, when you<br><br>• Open an account  • Apply for a loan<br>• Deposit money  • Use your credit or debit card<br>• Pay your bills<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br><br>• sharing for affiliates' everyday business purposes - information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |

## Definitions

| | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and non-financial companies.<br><br>• *Our affiliates include financial companies such as First Interstate BancSystem, Inc.* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and non-financial companies.<br><br>• *First Interstate Bank does not share with nonaffiliates so they can market to you.* |
| **Joint Marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>• *Our joint marketing partners include registered broker dealers.* |

# TERMS AND CONDITIONS
# OF YOUR ACCOUNT

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT** - To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth (for individuals), and other information that will allow us to identify you. We may also ask to see your driver's license (for individuals) or other identifying documents.

**AGREEMENT** - This document, along with the Fee Schedule and any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this document. If you have any questions, please call us.

This agreement and all services offered by us will be governed by federal law, by applicable state law, and by other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules. The applicable state law will be the law of the state where the account was opened. If your account is not opened in person, the law of the state of our home office shall govern. Currently, our home office is located in Billings, Montana. Notwithstanding the foregoing, the law of the state where the account owner or owners reside may control certain account matters. You should consult legal counsel for a clear understanding of how the law may affect your particular circumstances.

This agreement will be enforced in the courts of the state whose laws apply to the agreement and you consent and agree to the jurisdiction of those courts. You agree to bring any action or legal proceeding arising out of or connected with this agreement in the county where your account is located. Your account is located in the branch where it was opened. You may contact us at 1-855-342-3400 to confirm where your account is located.

The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

(1) summarize some laws that apply to common transactions;

(2) establish rules to cover transactions or events which the law does not regulate;

(3) establish rules for certain transactions or events which the law regulates but permits variation by agreement; and

(4) give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document. Nothing in this document is intended to vary our duty to act in good faith and with ordinary care when required by law.

As used in this document the words "we", "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

For Montana consumer account holders, the following will also apply: "Party" means a person who, by the terms of an account, has a present right, subject to request, to payment from the account other than as a beneficiary or agent.

**LIABILITY** - You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued and to apply later deposits (including direct deposits of social security benefits, other federal or state governmental benefits or other statutorily exempted sums) to these charges by way of setoff. You will pay any additional reasonable charges for services you request which are not covered by this agreement.

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available and regardless of the source of the funds. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you. If you have outstanding liability, we may refuse to cash checks presented by you or provide other bank products and services.

**DEPOSITS** - We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Before settlement of any item becomes final, we act only as your agent, regardless of the form of endorsement or lack of endorsement on the item and even though we provide you provisional credit for the item. We may reverse any provisional credit for items that are lost, stolen, or returned unpaid for any reason and at any time. Unless prohibited by law, we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing endorsement, claim of alteration, encoding error or other problem which in our judgment justifies reversal of credit. You authorize us to attempt to collect previously returned items without giving you notice, and in attempting to collect we may permit the payor bank to hold an item beyond the midnight deadline. Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. If you deliver a deposit to us and you will not be present when the deposit is counted, you must provide us an itemized list of the deposit (deposit slip). To process the deposit, we will verify and record the deposit, and credit the deposit to the account. If there are any discrepancies between the amounts shown on the itemized list of the deposit and the amount we determine to be the actual deposit, we will notify you of the discrepancy. You will be entitled to credit only for the actual deposit as determined by us, regardless of what is stated on the itemized deposit slip. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open. At our option, we may take an item for collection rather than for deposit. If we accept a third-party check for deposit, we may require any third-party endorsers to verify or guarantee their endorsements, or endorse in our presence. We reserve the right to refuse, return or limit any deposit you make to your account.

**WITHDRAWALS** -

**Generally** - Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs to open the account or has authority to make withdrawals may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person who signs or has authority to make withdrawals to endorse any item payable to you or your order for deposit to this account or any other transaction with us.

**Postdated checks** - A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act. Because we process checks mechanically, your notice will not be effective and we will not be liable for failing to honor your notice unless it precisely identifies the number, date, amount and payee of the item.

**Checks and withdrawal rules** - If you do not purchase your check blanks from us, you must be certain that we approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. In addition, we may place limitations on the account until your identity is verified.

Even if we honor a nonconforming request, we are not required to do so later. If you violate the stated transaction limitations (if any), in our discretion we may close your account or reclassify it as a transaction account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification.

If we are presented with an item drawn against your account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item.

See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal. An item may be returned after the funds from the deposit of that item are made available for withdrawal. In that case, we will reverse the credit of the item. You may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

**A temporary debit authorization hold affects your account balance** - On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Here is an example of how this can occur - assume for this example the following: (1) you have opted-in to our overdraft services for the payment of overdrafts on ATM and everyday debit card transactions, (2) we pay the overdraft, and (3) our overdraft fee is $30 per overdraft.

You have $120 in your account. You swipe your card at the card reader on a gasoline pump. Since it is unclear what the final bill will be, the gas station's processing system immediately requests a hold on your account in a specified amount, for example, $80. Our processing system authorizes a temporary hold on your account in the amount of $80, and the gas station's processing system authorizes you to begin pumping gas. You fill your tank and the amount of gasoline you purchased is only $50. Our processing system shows that you have $40 in your account available for other transactions ($120 - $80 = $40) even though you would have $70 on your account available for other transactions if the amount of the temporary hold was equal to the amount of your purchase ($120 - $50 = $70). Later, another transaction you have authorized is presented for payment from your account in the amount of $60 (this could be a check you have written, another debit card transaction, an ACH debit or any other kind of payment request). This other transaction is presented before the amount of the temporary hold is adjusted to the amount of your purchase (remember, it may take up to three days for the adjustment to be made). Because the amount of this other transaction is greater than the amount our processing system shows is available in your account, our payment of this transaction will result in an overdraft transaction. Because the transaction overdraws your account by $20, your account will be assessed the overdraft fee of $30 according to our overdraft fee policy. You will be charged this $30 fee according to our policy even though you would have had enough money in your account to cover the $60 transaction if your account had only been debited the amount of your purchase rather than the amount of the temporary hold or if the temporary hold had already been adjusted to the actual amount of your purchase.

3

**Overdrafts** - You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

**Multiple or required signatures, electronic check conversion, and similar transactions** - We process checks and other transaction items mechanically by relying on information encoded on those items or in electronic check conversions. An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions the check or similar item is either removed from circulation (truncated) or given back to you. We are not required to examine checks or other items drawn on your account. Although we collect signatures to obtain your agreement to the terms of your account, and may provide you with forms that allow you to elect the use of more than one signature, this does not create any responsibility on our part to verify signatures on items and other charges to your account or to verify the number of signatures on an item or transaction. If you establish accounts in which more than one signature is required to complete a transaction or use checks that require two or more signatures, such arrangements are strictly a matter of agreements you have with the persons you authorize, and you cannot assert a claim against us for permitting a transaction so long as any one of the owners or authorized persons sign or initiate the transaction.

**Notice of withdrawal** - We reserve the right to require not less than 7 days' notice in writing before each withdrawal from an interest-bearing account other than a time deposit or demand deposit, or from any other savings account as defined by Regulation D. (The law requires us to reserve this right, but it is not our general policy to use it.) Withdrawals from a time account prior to maturity or prior to any notice period may be restricted and may be subject to penalty. See your notice of penalty for early withdrawal.

**OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION (For Consumer Accounts)** - These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We reserve the right to refuse some forms of ownership on any or all of our accounts. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds. We are not under any obligation to notify and/or locate a beneficiary(ies) upon the death of the last surviving owner(s). After the death of the owner(s) and upon presentment of a certified death certificate(s), funds in the account will be paid to the beneficiary(ies) as indicated on the account or to the legally appointed heirs, executors or administrators of the beneficiary(ies).
The following applies to Montana consumer account holders:
**Single-Party Account** - Such an account is owned by one party.
**Multiple-Party Account** - Parties own the account in proportion to their net contributions unless there is clear and convincing evidence of a different intent. However, any one party may withdraw the entire amount on deposit in the account.
**RIGHTS AT DEATH - Single-Party Account** - At the death of a party, ownership passes as part of the party's estate.
**Multiple-Party Account With Right of Survivorship** - At death of party, ownership passes to surviving parties.
**Multiple-Party Account Without Right of Survivorship** - At death of party, deceased party's ownership passes as part of deceased party's estate.
**Single-Party Account With Pay-on-Death Designation** - At death of party, ownership passes to the designated pay-on-death beneficiaries and is not part of the party's estate.
**Multiple-Party Account With Right of Survivorship and Pay-on-Death Designation** - At death of last surviving party, ownership passes to the designated pay-on-death beneficiaries and is not part of the last surviving party's estate.
The following applies to Wyoming, South Dakota, Idaho, Oregon and Washington unless otherwise noted:
**Individual Account** - is an account in the name of one person.
**Joint Account - With Survivorship (And Not As Tenants In Common) (Referred to as a single party account in Washington)** - is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.
**Joint Account - No Survivorship (As Tenants In Common)** - is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person.
**Joint Account - Community Property (WA and ID only)** - is an account in the name of two persons with equal and undivided interests in the account during their lifetimes, with each spouse having the ability to exercise custodial control. Further incidents of community property ownership vary by state.
**Revocable Trust or Pay-On-Death Account** - If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either of these account types may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.
**BUSINESS, ORGANIZATION AND ASSOCIATION ACCOUNTS** - Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. You represent that you have the authority to open and conduct business on this account on behalf of the entity. We may require the governing body of the entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the entity.
**STOP PAYMENTS** - Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.
We may accept an order to stop payment on any item from any one of you. You must make any stop payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop payment cutoff time. Because stop payment orders are handled by computers, to be effective, your stop payment order must precisely identify the number, date, and amount of the item, and the payee. You may stop payment on any item drawn on your account whether you sign the item or not. Generally, if your stop payment order is given to us in writing it is effective for six months. Your order will lapse after that time if you do not renew the order in writing before the end of the six-month period. If the original stop payment order was oral, your stop payment order will lapse after 14 calendar days if it is not confirmed in writing within that time period. Confirmation of an oral stop payment order can be made by your written instructions or, we may, at our option, confirm your oral stop payment order by providing written confirmation to you. An oral stop payment order that is confirmed in writing within 14 calendar days is effective for six months from the date the oral stop payment order was received. We are not obligated to notify you when a stop payment order expires. A release of the stop payment request may be made only by the person who initiated the stop payment order, and must be made in writing.
If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop payment order.
Our stop payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).
**TRANSFER LIMITATIONS** - For savings and money market accounts you may make up to six transfers or withdrawals by means of a preauthorized, automatic, or telephonic transfer to another account of yours or to a third party or by check, debit card, or similar order to a third party during any calendar month (or statement cycle of at least four weeks). A preauthorized transfer includes any arrangement with us to pay a third party from your account at (i) a predetermined time, (ii) on a fixed schedule or (iii) upon oral or written orders including orders received through the automated clearing house (ACH). If the transfer or withdrawal is initiated in person, by mail, or at an ATM then there is no limit on the number of payments that may be made directly to you, directly to us or transfers to other accounts you have with us. Withdrawals by phone are also unlimited if you are requesting that a check be mailed to you.
**AMENDMENTS AND TERMINATION** - We may change any term of this agreement. Rules governing changes in interest rates are provided separately in the Truth-in-Savings or Specific Account Details disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. We may also close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail. Items presented for payment after the account is closed may be dishonored. When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items to be paid from the account. Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s). Unless expressly modified otherwise in your account agreement, any one of you can change the terms of an account (including closing an account) without the consent of other owners and notice of a change to your account by any one of you to us is notice by all of you.
**NOTICES** - Any written notice you give us is effective when we actually receive it, and it must be given to us according to the specific delivery instructions provided elsewhere, if any. We must receive it in time to have a reasonable opportunity to act on it. If the notice is regarding a check or other item, you must give us sufficient information to be able to identify the check or item, including the precise check or item number, amount, date and payee. Written notice we give you is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file. Notice to any of you is notice to all of you.
**STATEMENTS** - Statements are a valuable tool to help prevent fraudulent or mistaken transfers. Your statement will show the transactions that occurred in connection with your account during the statement period.
**Your duty to report unauthorized signatures, alterations and forgeries** - Your statement will provide sufficient information for you to reasonably identify the items paid (item number, amount, and date of payment). You should keep a record of each transaction as it is made so that when we give you the information in the statement, you will have a complete understanding of each transaction listed.
You have some responsibilities in connection with your statement. You must examine your statement with "reasonable promptness." Also, if you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you must bear the loss entirely yourself or share the loss with us (we may have to share some of the loss if we failed to use ordinary care and if we substantially contributed to the loss). The loss you might bear, in whole or part, could be not only with respect to items listed on the statement, but also other items with unauthorized signatures or alterations by the same wrongdoer. Of course, an attempt can be made to recover the loss from the thief, but this is often unsuccessful.
You agree that the time you have to examine your statement and report to us will depend on the circumstances, but you will not, in any circumstance, have a total of more than 14 days (for Montana Account Holders) or 30 days (for Wyoming, South Dakota, Idaho, Washington and Oregon Account Holders) from when we first send or make the statement available to you.
You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. This 60-day limitation is without regard to whether we exercised ordinary care. The limitation in this paragraph is in addition to those contained in the second paragraph of this section.

4

Contact us if you do not receive your statement... business days after you mailed the statement. We may charge a fee for additional copies or two years' worth of statements, notices, and returned checks, or in the alternative, the person who reviews these will be someone who does not have authority to transact business on the account.

Your duty to report other errors - In addition to the Commercial Code and other state law, you agree there is a common law duty to promptly review your statement for errors in addition to unauthorized signatures, alterations or forgeries. Promptly reviewing your statement is valuable to both you and us because it can help identify, correct and prevent future mistakes.

In addition to your duty to review your statement for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error - such as an encoding error. In addition, if you receive or we make available either your items or images of your items, you must examine them for any unauthorized or missing endorsements or any other problems. You agree that the time you have to examine your statement and items and report to us will depend on the circumstances. However, this time period shall not exceed 60 days. Failure to examine your statement and items and report any errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any errors on items identified in that statement and as between you and us the loss will be entirely yours. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the 60 day time period to report other errors.

Errors relating to electronic fund transfers or substitute checks - For information on errors relating to electronic fund transfers (e.g., computer, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution. For information on errors relating to a substitute check you received, refer to your disclosure entitled Substitute Checks and Your Rights.

ACCOUNT TRANSFER - If you attempt to transfer or assign all or a part of your account, we will not be bound by the transfer or assignment until we agree in writing to the transfer or assignment. We are not required to accept or recognize any transfer or assignment. Unless we agree otherwise in writing, any rights of a transferee or assignee will be subject to our right of setoff or prior security interest. We have no obligation to notify you or any other person disbursing any funds from your account in accordance with what we in good faith believe to be the terms of the transfer or assignment.

DIRECT DEPOSITS - If we are required for any reason to reimburse the federal government for all or any portion of a benefit payment that was directly deposited into your account, you authorize us to deduct the amount of our liability to the federal government from the account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

SETOFF AND SECURITY INTEREST - If you owe us money as a borrower, guarantor or otherwise, and the debt becomes past due, we have the right under law (this right is called the right of "setoff") and under this agreement to use the money in the account to pay the debt you owe us. If this account is owned by one or more of you as individuals, we may set off any funds in the account against a due and payable debt a partnership owes us now or in the future, to the extent of your liability as a partner for the partnership debt. If your debt arises from a promissory note, then the amount of the due and payable debt will be the full amount we have demanded, as entitled under the terms of the note, and this amount may include any portion of the balance for which we have properly accelerated the due date.

This right of setoff does not apply to this account if prohibited by law. For example, the right of setoff does not apply to this account if: (a) it is an Individual Retirement Account or similar tax-deferred account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity, or (d) setoff is prohibited by the Military Lending Act or its implementing regulations. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff. In addition to the forgoing and in order to secure the payment and performance of all present and future debts and other obligations of any kind, due to us from you under any agreement or otherwise, whether direct or indirect, contingent or non-contingent and whether or not now contemplated, you hereby grant us a security interest in your deposit account(s) and all renewals, substitutions, extensions, replacements and proceeds thereof; provided, however, that no security interest in this deposit account shall be effective to secure: (a) any credit or obligation to which "Truth in Lending" Regulation Z, 12 C.F.R. Pt. 226, shall apply, unless and until any required disclosure of this security interest shall have been made; or (b) any indebtedness secured only by a security interest in real property that is your principal residence. The security interest granted to us in this agreement does not apply if otherwise prohibited by law. It is intended that our security interest granted from the outset, notwithstanding our exercise of certain rights may be conditioned upon the occurrence of a default.

RESTRICTIVE LEGENDS OR ENDORSEMENTS - The automated processing of the large volume of checks we receive prevents us from inspecting or looking for restrictive legends, restrictive endorsements or other special instructions on every check. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1,000.00." The payee's signature accompanied by the words "for deposit only" is an example of a restrictive endorsement. For this reason, we are not required to honor any restrictive legend or endorsement or other special instruction placed on checks you write unless we have agreed in writing to the restriction or instruction. Unless we have agreed in writing, we are not responsible for any losses, claims, damages, or expenses that result from your placement of these restrictions or instructions on your checks.

PAYMENT ORDER OF ITEMS - The law permits us to pay items drawn on your account in any order (for purposes of this section "items" means checks, orders and electronic transactions). To assist you in handling your account with us, we are providing you with the following information regarding how we process those items.

When processing items drawn on your account, our policy is to pay them in this order: ATM and debit card transactions, ACH transactions, transactions with no check number, and checks in check number order. Lower check numbers are paid first. The order in which items are paid is important if there is not enough money in your account to pay all of the items that are presented. There is no policy that is favorable in every instance. If the smallest items are paid first, you may have fewer NSF or overdraft fees, but the largest, and perhaps more important items (such as rent or mortgage payments) might not be paid. However, if the largest items are paid first, most important items might be paid but it may increase the overdraft or NSF fees if funds are not available to pay all of the items. We think our policy attains a reasonable balance between minimizing additional cost to you and paying your more important items.

If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (NSF). The amounts of the overdraft and NSF fees are disclosed elsewhere. We encourage you to make careful records and practice good account management. This will help you to avoid creating items without sufficient funds and incurring the resulting fees.

CHECK PROCESSING - We process items mechanically by relying solely on the information encoded in magnetic ink along the bottom of the items. This means that we do not individually examine all of your items to determine if the item is properly completed, signed and endorsed or to determine if it contains any information other than what is encoded in magnetic ink. You agree that we have exercised ordinary care if our automated processing is consistent with general banking practice, even though we do not inspect each item. Because we do not inspect each item, if you write a check to multiple payees, we can properly pay the check regardless of the number of endorsements unless you notify us in writing that the check requires multiple endorsements. We must receive the notice in time for us to have a reasonable opportunity to act on it, and you must tell us the precise date of the check, amount, check number and payee. We are not responsible for any unauthorized signature or alteration that would not be identified by a reasonable inspection of the item. Using an automated process helps us keep costs down for you and all account holders.

CHECK CASHING - We may charge a fee for anyone that does not have an account with us who is cashing a check, draft or other instrument written on your account. We may also require reasonable identification to cash such a check, draft or other instrument. We can decide what identification is reasonable under the circumstances and such identification may be documentary or physical and may include collecting a thumbprint or fingerprint.

You agree that we may refuse to cash a check for anyone who has an account with us when liability currently exists for account shortages resulting from charges or overdrafts.

DEBIT CARD HOLDS - Hold is placed automatically on the account for the amount of the debit card transaction. The hold remains on those funds until the merchant presents the transaction for payment.

FACSIMILE SIGNATURES - Unless you make advance arrangements with us, we have no obligation to honor facsimile signatures on your checks or other orders or otherwise. If we do agree to honor items containing facsimile signatures, you authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us and you. You give us this authority regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose. If you use a facsimile signature, you agree you shall have sole responsibility for maintaining security of the facsimile signature or device by which it is affixed and you shall bear the entire risk for unauthorized use thereof whether or not you are negligent. You agree that no facsimile signature we have been authorized to honor may be considered a forgery or an unauthorized signature, but that such facsimile signature shall be effective as your signature or endorsement whether or not you are negligent. You further agree to indemnify and hold us harmless from and against any and all loss, damages, costs, charges and liabilities of every kind and nature, including attorney's fees, or you may suffer or incur as a result of the unlawful use, unauthorized use or misuse by any person of any such facsimile signature or the device by which it is affixed. You must notify us at once if you suspect that your facsimile signature is being or has been misused.

PLEDGES - Each owner of this account may pledge all or any part of the funds in it for any purpose to which we agree. Any pledge of this account must first be satisfied before the rights of any surviving account owner of a beneficiary become effective. For example, if an account has two owners and one of the owners pledges the account (i.e., uses it to secure a debt) and then dies: (1) the surviving owner's rights in this account do not take effect until the debt has been satisfied, and (2) the debt may be satisfied with the funds in this account.

AGENTS AND POWERS OF ATTORNEY - On a form acceptable to us, you may appoint an agent, authorized signer or grant a power of attorney to someone to act for you on your account ("Agent"). Unless expressly stated otherwise, we presume that the Agent is designated to conduct transactions on the owner's behalf and is authorized by you for all purposes relating to the account, including, but not limited to, endorsing items, stopping payments (including stopping items issued by you), and making deposits and withdrawals, but excepting the right to close the account or affect the rights of the owners or beneficiaries, if any. Your Agent does not acquire any ownership rights, and you, as owner, do not give up any right to act on your account. You are responsible for the transactions of the Agent and we undertake no obligation to monitor the transactions to determine that they are on your behalf. We may refuse to recognize an Agent or comply with a power of attorney for reasonable cause. You may terminate the agency at any time, and the agency is automatically terminated upon the death of the owner. In addition, if the power of attorney is not "durable," it is revoked when you become incapacitated or incompetent. However, we may continue to honor the transactions of the Agent until: (a) we have received written notice or have actual knowledge of the termination of the agency, and (b) we have a reasonable opportunity to act on that notice or knowledge.

STALE-DATED CHECKS - We are not obligated to, but may at our option, pay a check, other than a certified check, presented for payment more than six months after its date. If you do not want us to pay a stale-dated check, you must place a stop-payment order on the check in the manner we have described elsewhere.

FDIC INSURANCE - Funds in your account(s) with us are insured by the Federal Deposit Insurance Corporation (FDIC) and backed by the full faith and credit of the United States. The amount of insurance coverage you have depends on the number of accounts you have with us that are of different "ownership." An individual account is one unique form of "ownership"; a joint account, a pay-on-death account, and a self directed qualified retirement account (e.g., an IRA) are examples of some of the others. Deposit insurance for a person's self directed qualified retirement account is up to $250,000. (An IRA is a self directed qualified retirement account as is any account where the owner decides where and how to invest the balance.) Funds are insured to $250,000 per depositor for the total of funds combined in all of your other insured accounts with us. If you want a more detailed explanation or additional information, you may ask us or contact the FDIC. You can also visit the FDIC website at www.fdic.gov and click on the Deposit Insurance link. The link includes detailed contact information as well as a deposit insurance estimator.

ENDORSEMENTS - We may accept for deposit any item payable to you or your order, even if they are not endorsed by you. We may give cash back to any one of you. We may supply any missing endorsement(s) for any item we accept for deposit or collection, and you warrant that all endorsements are genuine.

To ensure that your check or share draft is processed without delay, you must endorse it (sign it on the back) in a specific area. Your entire endorsement (whether a signature or a stamp) along with any other endorsement information (e.g. additional endorsements, ID information, driver's license number, etc.) must fall within 1 1/2" of the "trailing edge" of a check. Endorsements must be made in blue or black ink, so that they are readable by automated check processing equipment.

As you look at the front of a check, the "trailing edge" is the left edge. When you flip the check over, be sure to keep all endorsement information within 1 1/2" of that edge.



It is important that you confine the endorsement information to this area since the remaining blank space will be used by others in the processing of the check to place additional needed endorsements and information. You agree that you will indemnify, defend, and hold us harmless for any loss, liability, damage or expense that occurs because your endorsement, another endorsement or information you have printed on the back of the check obscures our endorsement.

These endorsement guidelines apply to both personal and business checks.

UNCLAIMED PROPERTY - The law establishes procedures under which unclaimed property must be surrendered to the state. (We may have our own rules regarding dormant accounts, and if we charge a fee for dormant accounts it will be disclosed to you elsewhere.) Generally, the funds in your account are considered unclaimed if you have not had any activity or communication with us regarding your account over a period of years. Ask us if you want further information about the period of time or type of activity that will prevent your account from being unclaimed. If your funds are surrendered to the state, you may be able to reclaim them, but your claim must be presented to the state. Once your funds are surrendered, we no longer have any liability or responsibility with respect to the funds.

DEATH OR INCOMPETENCE - You agree to notify us promptly if any person with a right to withdraw funds from your account(s) dies or is adjudicated (determined by the appropriate official) incompetent. We may continue to honor your checks, items, and instructions until: (a) we know of your death or adjudication of incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You agree that we may pay or certify checks drawn on or before the date of death or adjudication of incompetence for up to ten (10) days after your death or adjudication of incompetence unless ordered to stop payment by someone claiming an interest in the account.

UTMA ACCOUNTS (For Consumer Accounts) - Under the Uniform Transfers to Minors Act, the funds in the account are owned by the child who has unconditional use of the account when he or she reaches the age of majority. Before that time, the account may be accessed only by the custodian (or successor custodian), and the funds must be used for the benefit of the child. We, however, have no duty or agreement whatsoever to monitor or insure that the acts of the custodian (or successor custodian) are for the child's benefit. We are not responsible to monitor age or eligibility for an UTMA account, even though our records may include the minor's date of birth. It is the custodian's responsibility to properly distribute the funds in the account upon the minor's death or attainment of the age of majority. For this type of account, the child's SSN/TIN is used for the Backup Withholding Certification.

FIDUCIARY ACCOUNTS - Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters.

IOLTA ACCOUNTS - If you have an "Interest on Lawyers' Trust Account (IOLTA)," we will provide any information requested about your account to the administrator of your state IOLTA program or other entity designed to receive such information by the laws or lawyer bar rules of your state. Information we provide may include your federal tax identification number, account number, client name, interest date, rate and amount paid, average available balance and current average balance. We may provide such additional or alternative information as may be directed by these entities from time to time without prior notice to you.

CASH TRANSACTION REPORTING - To help law enforcement agencies detect illegal activities, the law requires all financial institutions to gather and report information on some types of cash transactions. If the information we need to complete the report is not provided, we are required to refuse to handle the transaction. If you have any questions regarding these rules, please contact your local Internal Revenue Service office.

BACKUP WITHHOLDING/TIN CERTIFICATION - Federal tax law requires us to report interest payments we make to you of $10 or more in a year, and to include your taxpayer identification number (TIN) on the report. Interest includes dividends, interest and bonus payments for purposes of this rule. Therefore, we require you to provide us with your TIN and to certify that it is correct. The TIN is either a social security number (SSN) or an employer identification number (EIN). For most organization or business accounts other than sole proprietorships, the appropriate TIN is the EIN of the organization or business entity. For sole proprietorships, either the SSN or the EIN is appropriate. However, we must supply the IRS with both the individual owner's name and the business name of the sole proprietorship. The appropriate TINs for various other types of accounts are:

Account type - TIN
Individual - SSN of the individual.
Joint Account - SSN of the owner named first on the account.
Uniform Gift/Transfer to Minor - SSN of the minor.
Informal (Revocable) Trust - SSN of the owner.

In some circumstances, federal law requires us to withhold and pay to the IRS a percentage of the interest that is earned on funds in your accounts. This is known as backup withholding. We will not have to withhold interest payments when you open your account if you certify your TIN and certify that you are not subject to backup withholding due to underreporting of interest. We may subsequently be required to begin backup withholding if the IRS informs us that you supplied an incorrect TIN or that you underreported your interest income. If you do not have a TIN, we may defer backup withholding if you certify that you do not have a TIN but have applied for one. However, we must begin backup withholding if you do not supply us with a certified TIN within 60 days. If you do not have a TIN because you are a foreign person (either an individual who is a nonresident alien or a foreign organization) you must certify your foreign status. If you are an exempt payee (receiver of interest payments), you do not need to certify your TIN, but you will have to certify your exempt status and supply us with your TIN. The most common exempt payees are corporations, organizations exempt from tax under Section 501(a), and an individual retirement plan or a custodial account under Section 403(b)(7). If you do not supply us with the appropriate TIN, we may refuse to open your account.

CREDIT VERIFICATION - You agree that we may verify credit and employment history by any necessary means, including preparation of a credit report by a credit reporting agency.

LOST, DESTROYED, OR STOLEN CERTIFIED, CASHIER'S, OR TELLER'S CHECKS - Under some circumstances you may be able to assert a claim for the amount of a lost, destroyed, or stolen certified, cashier's or teller's check. To assert the claim: (a) you must be the remitter (or drawer of a certified check) or payee of the check, (b) we must receive notice from you describing the check with reasonable certainty and asking for payment of the amount of the check, (c) we must receive the notice in time for us to have a reasonable opportunity to act on it, and (d) you must give us a declaration (in a form we require) of your loss with respect to the check. You can ask us for a declaration form. Even if all of these conditions are met, your claim may not be immediately enforceable. We may pay the check until the ninetieth day after the date of the check (or date of acceptance of a certified check). Therefore, your claim is not enforceable until the ninetieth day after the date of the check or date of acceptance, and the conditions listed above have been met. If we have not already paid the check, on the day your claim is enforceable we become obligated to pay you the amount of the check. We will pay you in cash or issue another certified check.

At our option, we may pay you the amount of the check before your claim becomes enforceable. However, we will require you to agree to indemnify us for any losses we might suffer. This means that if the check is presented after we pay your claim, and we pay the check, you are responsible to cover our losses. We may require you to provide a surety bond to assure that you can pay us if we suffer a loss.

CHANGING ACCOUNT PRODUCTS - We may change your account to another product offered by us at any time by giving you notice that your account will be changed to another product on a specified date. If your account is a time account, the change will not occur before the next maturity date of your account. If you do not close your account before the date specified in the notice, we may change your account to that other product on the date specified in the notice.

TRANSACTIONS BY MAIL - You may deposit checks by mail. You should endorse the check being sent through the mail with the words "For Deposit Only" and should include your correct account number underneath to ensure the check is credited to the correct account. You should use the pre-encoded checking deposit slips found behind your checks in your checkbook. If you do not use your deposit slip or provide us with instructions indicating how or where the check should be credited, we may apply it to any account or any loan balance you have with us or we may return the check to you. Receipts for such transactions will be mailed to you only if a self-addressed stamped envelope is provided. Following your deposit, examine your statement carefully or call us to ensure that we received the item. Do not send cash through the mail for deposit.

LEGAL ACTIONS AFFECTING YOUR ACCOUNT - If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions.

CHECK STORAGE AND COPIES - You agree that you will not receive your canceled checks. We will store your canceled checks or copies of them for a reasonable retention period. You may request copies from us in the manner we require.

SECURITY - It is your responsibility to protect the account number(s) and access device(s) (e.g., an ATM card, point-of-sale card and/or PIN) for your account(s). Do not discuss, compare, or share information about your account number(s) or access device(s) with anyone unless you are willing to give them full use of your money. Checks and electronic withdrawals are processed by automated methods, and anyone who obtains your account number or access device could use it to withdraw money from your account, with or without your permission.

Except for consumer electronic funds transfers subject to Regulation E, you agree that if we offer you services appropriate for your account to help identify and limit fraud or other unauthorized transactions against your account, such as positive pay or commercially reasonable security procedures, and you reject those services, you will be responsible for any fraudulent or unauthorized transactions which could have been prevented by the services we offered, unless we acted in bad faith or to the extent our negligence contributed to the loss.

6

**Account numbers** - These are generally used to process checks and drafts as well as transactions like a telecheck or demand draft and can be used to withdraw money from your account. Your account number can also be used to issue a "remotely created check." Like a typical check, a remotely created check (sometimes called a telecheck, preauthorized draft or demand draft) is a draft or check that can be used to withdraw money from your account. Unlike a typical check or draft, however, a remotely created check is not issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner). If you have truly authorized the remotely created check (to purchase a service or merchandise, for example), it is properly payable. But it can be risky to authorize a remotely created check. A swindler could issue a remotely created check in an amount greater than you authorized, or issue additional remotely created checks that you have not authorized. We will not know if the withdrawal is unauthorized or in an amount greater than the amount you have authorized. Payment can be made from your account even though you did not contact us directly and order the payment.

**Access devices** - If you furnish your access device and grant actual authority to make transfers to someone who then exceeds that authority, you will be liable for the transfers unless we have been notified that transfers by that person are no longer authorized. Please review the additional information you have received or will receive regarding transfers by access device.

**Blank checks** - You must also take precaution in safeguarding your blank checks. Notify us at once if you think your blank checks have been lost or stolen. As between you and us, if you are negligent in safeguarding your checks, you must bear the loss entirely yourself, or share the loss with us if we failed to use ordinary care which substantially contributes to the loss.

**TRUNCATION, SUBSTITUTE CHECKS, AND OTHER CHECK IMAGES** - If you truncate an original check and create a substitute check, or other paper or electronic image of the original check, you warrant that no one will be asked to make payment on the original check, a substitute check or any other electronic or paper image, if the payment obligation relating to the original check has already been paid. You also warrant that any substitute check you create conforms to the legal requirements and generally accepted specifications for substitute checks. You agree to retain the original check in conformance with our internal policy for retaining original checks. You agree to indemnify us for any loss we may incur as a result of any truncated check transaction you initiate. We can refuse to accept substitute checks that have not previously been warranted by a bank or other financial institution in conformance with the Check 21 Act. Unless specifically stated in a separate agreement between you and us, we do not have to accept any other electronic or paper image of an original check.

**REMOTELY CREATED CHECKS** - Like any standard check or draft, a remotely created check (sometimes called a telecheck, preauthorized draft or demand draft) is a check or draft that can be used to withdraw money from an account. Unlike a typical check or draft, however, a remotely created check is not issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner). In place of a signature, the check usually has a statement that the owner authorized the check or has the owner's name typed or printed on the signature line.

You warrant and agree to the following: for every remotely created check we receive from you for deposit or collection: (1) you have received express and verifiable authorization to create the check in the amount and to the payee that appears on the check; (2) you will maintain proof of the authorization for at least 2 years from the date of the authorization, and supply us the proof if we ask; and (3) if a check is returned you owe us the amount of the check, regardless of when the check is returned. We may take funds from your account to pay the amount you owe us, and if there are insufficient funds in your account, you still owe us the remaining balance.

**UNLAWFUL INTERNET GAMBLING NOTICE** - Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

**TELEPHONIC INSTRUCTIONS** - Unless required by law or we have agreed otherwise in writing, we are not required to act upon instructions you give us via facsimile transmission or leave by voice mail or on a telephone answering machine.

**MONITORING AND RECORDING TELEPHONE CALLS AND CONSENT TO RECEIVE COMMUNICATIONS** - Subject to federal and state law, we may monitor or record phone calls for security reasons, to maintain a record and to ensure that you receive courteous and efficient service. You consent in advance to any such recording.

To provide you with the best possible service in our ongoing business relationship for your account we may need to contact you about your account from time to time by telephone, text messaging or email. However, we must first obtain your consent to contact you about your account because we must comply with the consumer protection provisions in the federal Telephone Consumer Protection Act of 1991 (TCPA), CAN-SPAM Act and their related federal regulations and orders issued by the Federal Communications Commission (FCC).

♦ Your consent is limited to your account, and as authorized by applicable law and regulations.

♦ Your consent does not authorize us to contact you for telemarketing purposes (unless you otherwise agreed elsewhere).

With the above understandings, you authorize us to contact you regarding your account throughout its existence using any telephone numbers or email addresses that you have previously provided to us or that you may subsequently provide to us.

This consent is regardless of whether the number we use to contact you is assigned to a landline, a paging service, a cellular wireless service, a specialized mobile radio service, other radio common carrier service or any other service for which you may be charged for the call. You further authorize us to contact you through the use of voice, voice mail and text messaging, including the use of pre-recorded or artificial voice messages and an automated dialing device.

If necessary, you may change or remove any of the telephone numbers or email addresses at any time using any reasonable means to notify us.

**CLAIM OF LOSS** - If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your account, the transaction, and the circumstances surrounding the loss. You will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you.

You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources.

**EARLY WITHDRAWAL PENALTIES (and involuntary withdrawals)** - We may impose early withdrawal penalties on a withdrawal from a time account even if you don't initiate the withdrawal. For instance, the early withdrawal penalty may be imposed if the withdrawal is caused by our setoff against funds in the account or as a result of an attachment or other legal process. We may close your account and impose the early withdrawal penalty on the entire account balance in the event of a partial early withdrawal. See your notice of penalty for early withdrawals for additional information.

Savings accounts with a $0 balance for 10 consecutive business days will be automatically closed. Checking accounts with a $0 balance for 30 consecutive business days will be automatically closed.

**ADDRESS OR NAME CHANGES** - You are responsible for notifying us of any change in your address or your name. Unless we agree otherwise, change of address or name must be made in writing by at least one of the account holders. Informing us of your address or name change on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent address you have provided to us. If provided elsewhere, we may impose a service fee if we attempt to locate you.

**RESOLVING ACCOUNT DISPUTES** - We may place an administrative hold on the funds in your account (refuse payment or withdrawal of the funds) if it becomes subject to a claim adverse to (1) your own interest; (2) others claiming an interest as survivors or beneficiaries of your account; or (3) a claim arising by operation of law. The hold may be placed for such period of time as we believe reasonably necessary to allow a legal proceeding to determine the merits of the claim or until we receive evidence satisfactory to us that the dispute has been resolved. We will not be liable for any items that are dishonored as a consequence of placing a hold on funds in your account for these reasons.

**WAIVER OF NOTICES** - To the extent permitted by law, you waive any notice of non-payment, dishonor or protest regarding any items credited to or charged against your account. For example, if you deposit a check and it is returned unpaid or we receive a notice of nonpayment, we do not have to notify you unless required by federal Regulation CC or other law.

**FUNDS TRANSFERS** - The terms used in this section have the meaning given to them in Article 4A of the Uniform Commercial Code - Funds Transfers (UCC 4A). This section will generally not apply to you if you are a consumer. However, even if you are a consumer, this section will apply to that part of any funds transfer that is conducted by Fedwire. We generally use FedWire for domestic wire transfers and Bank of New York for international wire transfers, but we may use any means and routes that we, in our sole discretion, may consider suitable for the transmission of funds. By initiating a wire transfer, whether domestic or international, you agree to be bound by all applicable terms of this Section. This section is subject to UCC 4A as adopted in the state in which you have your deposit with us. This agreement is also subject to all clearing house association rules, rules of the Board of Governors of the Federal Reserve System and their operating circulars, and, with respect to wire transfers, Regulation J, 12 CFR Part 210, Subpart B and the appendices thereto, and the Electronic Fund Transfer Act of 1978, as amended (EFTA), and its implementing regulation E, as applicable and to the extent that the wire transfer payment order was carried out. If any part of this agreement is determined to be unenforceable, the rest of the agreement remains effective. This agreement controls funds transfers unless supplemented or amended in a separate written agreement signed by us. This agreement does not apply to a funds transfer if any part of the transfer is governed by the Electronic Fund Transfer Act of 1978 (EFTA), except this agreement does apply to a funds transfer that is a remittance transfer as defined in EFTA unless the remittance transfer is an electronic fund transfer as defined in EFTA.

**Funds transfer** - A funds transfer is the transaction or series of transactions that begin with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. A funds transfer is completed by the acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's order. You may give us a payment order orally, electronically, or in writing, but your order cannot state any condition to payment to the beneficiary other than the time of payment. Credit entries may be made by ACH.

**Authorized account** - An authorized account is a deposit account you have with us that you have designated as a source of payment of payment orders you issue to us. If you have not designated an authorized account, any account you have with us is an authorized account to the extent that payment of the payment order is not inconsistent with the use of the account.

**Acceptance of your payment order** - We are not obligated to accept any payment order that you give us, and we reserve the right to refuse to accept or execute a payment order for no reason or any reason, although we normally will accept or execute your payment order if you have a withdrawable credit in an authorized account sufficient to cover the order. If we do not execute your payment order, but give you notice of our rejection of your payment order after the execution date or give you no notice, we are not liable to pay you as restitution any interest on a withdrawable credit in a non-interest-bearing account. It may take up to 24 hours to process the payment order for a wire transfer once it is received by the Bank.

**Cutoff time** - If we do not receive your payment order or communication canceling or amending a payment order before our cutoff time on a funds transfer day for that type of order or communication, the order or communication will be deemed to be received at the opening of our next funds transfer business day.

**Payment of your order** - If we accept a payment order you give us, we may receive payment by automatically deducting from any authorized account the amount of the payment order plus the amount of any expenses and charges for our services in execution of your payment order. We are entitled to payment on the payment or execution date. Unless your payment order specifies otherwise, the payment or execution date is the funds transfer date we receive the payment order. The funds transfer is completed upon acceptance by the beneficiary's bank. Your obligation to pay your payment order is excused if the funds transfer is not completed, but you are still responsible to pay us any expenses and charges for our services. However, if you told us to route the funds transfer through an intermediate bank, and we are unable to obtain a refund because the intermediate bank that you designated has suspended payments, then you are still obligated to pay us for the payment order. You will not be entitled to interest on any refund you receive because the beneficiary's bank does not accept the payment order.

**Security procedure** - As described more fully in a separate writing, the authenticity of a payment order or communication canceling or amending a payment order issued in your name as sender may be verified by a security procedure. You affirm that you have no circumstances which are relevant to the determination of a commercially reasonable security procedure unless those circumstances are expressly contained in a separate writing signed by us. You may choose from one or more security procedures that we have developed, or for all funds transfers other than wire transfers, you may develop your own security procedure if it is acceptable to us. If you reject a commercially reasonable security procedure that we have offered you, you

7

agree that you will be bound by any payment order issued in your name, whether or not authorized, that we accept in good faith and in compliance with the security procedure you have chosen. For wire transfers, if we attempt to verify authorization and for any reason we are not satisfied that the payment order was issued by a person named on the account, we may refuse to execute the payment order.

**Duty to report unauthorized or erroneous payment** - ACH Transactions Involving Business Accounts: Pursuant to the National Automated Clearing House Association Rules, owners of business accounts have only 24 hours after a transaction is posted to identify, report, and return unauthorized and fraudulent ACH transactions. Because of this Rule, unauthorized and fraudulent ACH transactions must be reported to us during business hours on the business day following posting so that the transaction can be timely returned. For all other Accounts and Transactions: You must exercise ordinary care to determine that all payment orders or amendments to payment orders that we accept that are issued in your name are authorized, enforceable, in the correct amount, to the correct beneficiary, and not otherwise erroneous. If you discover (or with reasonable care should have discovered) an unauthorized, unenforceable, or erroneously executed payment order or amendment, you must exercise ordinary care to notify us of the relevant facts. The time you have to notify us will depend on the circumstances, but that time will not in any circumstance exceed 14 days from when you are notified of our acceptance or execution of the payment order or amendment or that your account was debited with respect to the order or amendment. If you do not provide us with timely notice you will not be entitled to interest on any refundable amount. If we can prove that you failed to perform either of these duties with respect to an erroneous payment and that we incurred a loss as a result of the failure, you are liable to us for the amount of the loss not exceeding the amount of your order.

**Identifying number** - If your payment order identifies an intermediate bank, beneficiary bank, or beneficiary by name and number, we and every receiving or beneficiary bank may rely upon the identifying number rather than the name to make payment, even if the number identifies an intermediate bank or person different than the bank or beneficiary identified by name. Neither we nor any receiving or beneficiary bank have any responsibility to determine whether the name and identifying number refer to the same financial institution or person.

**Record of oral or telephone orders** - You agree that we may, if we choose, record any oral or telephone payment order or communication of amendment or cancelation.

**Notice of credit** - If we receive a payment order to credit an account you have with us, we are not required to provide you with any notice of the payment order or the credit. We will provide you with notification of receipt of your wire transfer in your next periodic statement.

**Provisional credit** - You agree to be bound by the automated clearing house association operating rules that provide that payments made to you or originated by you by funds transfer through the automated clearing house system are provisional until final settlement is made through a Federal Reserve Bank or otherwise payment is made as provided in Article 4A-403(a) of the Uniform Commercial Code.

**Refund of credit** - You agree that if we do not receive payment of an amount credited to your account, we are entitled to a refund from you in the amount credited and the party originating such payment will not be considered to have paid the amount so credited.

**Amendment of funds transfer agreement** - From time to time we may amend any term of this agreement by giving you reasonable notice in writing. We may give notice to anyone who is authorized to send payment orders to us in your name, or to anyone who is authorized to accept service.

**Cancelation or amendment of payment order** - You cannot cancel or amend a domestic wire transfer request after it has been received by us. You cannot cancel or amend an international wire transfer request after it has been received by us unless you are a consumer. Cancelation requests from consumers for international wire transfers must be received by us no later than 30 minutes after the request for the wire transfer is made. When you contact us to cancel an international wire transfer, you must provide information to help us identify the international wire transfer you wish to cancel, including the amount and location where the funds were sent. We will refund your money within three business days of your request to cancel the international wire transfer unless the funds have already been picked up or deposited into the recipient's account. For all fund transfers other than wire transfers, you may cancel or amend a payment order you give us only if we receive the communication of cancelation or amendment before our cutoff time and in time to have a reasonable opportunity to act on it before we accept the payment order. The communication of cancelation or amendment must be presented in conformity with the same security procedure that has been agreed to for payment orders.

**Intermediaries** - We are not liable for the actions of any intermediary, regardless of whether or not we selected the intermediary. We are not responsible for acts of God, outside agencies, or nonsalaried agents.

**Limit on liability** - You waive any claim you may have against us for consequential or special damages, including loss of profit arising out of a payment order or funds transfer, unless this waiver is prohibited by law. We are not responsible for attorney fees you might incur due to erroneous execution of payment order.

**Erroneous execution** - If we receive an order to pay you, and we erroneously pay you more than the amount of the payment order, we are entitled to recover from you the amount in excess of the amount of the payment order, regardless of whether you may have some claim to the excess amount against the originator of the order.

**Objection to payment** - If we give you a notice that reasonably identifies a payment order issued in your name as sender that we have accepted and received payment for, you cannot claim that we are not entitled to retain the payment unless you notify us of your objection to the payment within 60 days of our notice to you.

**International Wire Transfers** - This paragraph applies only to consumer accounts, as defined by Regulation E; therefore, the meaning of the term "you" in this paragraph is limited to consumers. After each international wire transfer request and prior to payment, we will immediately provide you with a Pre-payment Disclosure, providing the details of your international wire transfer request.

In case of an error or problem with your international wire transfer request, you should, as soon as possible, notify us via one of the following methods:
- ◆ Call us at 888-833-3458 or contact your local branch; callers who are hearing or speech impaired should dial 711 or use a preferred Telecommunications Relay Service during customer service hours.
- ◆ Write us at:
  First Interstate Bank
  401 North 31st Street
  Billings, Montana 59101
- ◆ Fill out a Wire Transfer Dispute Form located at https://www.firstinterstatebank.com/applications/wire_transfer_dispute/

You must contact us within 180 days of the date we stated that funds would be made available to the recipient. Please be prepared to provide us with the following when you contact us:

a. Your name and address (or telephone number); b. The error or problem with the transfer, and why you believe it is an error or problem and, if possible, the date of the error; c. The name of the person receiving the funds and, if possible, his or her telephone number or address; d. The dollar amount of the transfer; and, e. The confirmation code or number of the transaction.

We will determine whether an error occurred within 90 days after you contact us. We will inform you of the results within three business days after completing the investigation. If we decide that there was an error, you will be notified of the available remedies, and we will correct the error promptly and in accordance with the remedy that you select. If we decide that there was no error, you will be provided with a written explanation. You may request copies of any documents used in the investigation.

---

# WIRE TRANSFER AGREEMENT AND DISCLOSURE

In this Wire Transfer Agreement and Disclosure, the words "you" and "your" mean a First Interstate Bank account holder. The term "consumer account holder" refers only to a First Interstate Bank account holder that is a consumer. The word "Bank" means First Interstate Bank. The term "wire transfer" refers to a funds transfer.

**Fedwire:** The Bank will generally use FedWire for domestic wire transfers and Wells Fargo Bank for international wire transfers, but it may use any means and routes that the Bank, in its sole discretion, may consider suitable for the transmission of funds. You authorize the Bank to debit the account or accounts designated by you for the amount of funds designated by you.

**Name of Beneficiary and Financial Institution:** If the payment order identifies the beneficiary (recipient of the funds) by both name and an identifying number or account number, payment may be made on the basis of the identifying number or account number, even if the number identifies a person different from the named beneficiary. If the payment order identifies a receiving financial institution by both name and identifying number, a receiving financial institution may rely on the number as the proper identification, even if the number identifies a person different from the named financial institution. You are still liable to the Bank for the amount of the wire transfer, even if payment of the wire transfer is made to a person different from the named beneficiary based on the beneficiary's identifying number or account number provided by you or if payment of the wire transfer is made to a financial institution different from the one identified by name based on the identifying number provided by you.

**Acceptance:** The Bank is not required to accept any payment order, and may refuse to accept a payment order for any reason. The Bank will not accept a payment order on the day on which the payment order is received, unless it is received within a reasonable time before any cut-off hour established by the Bank. It may take up to 24 hours to process the payment order once it is received by the Bank. Unless otherwise agreed by the Bank in writing, no payment order is accepted by the Bank until it is executed.

**Security Procedure:** All payment orders will be authorized in accordance with the Bank's security procedures, and you agreed to comply with any security procedures the Bank may require. If the Bank attempts to verify authorization and for any reason is not satisfied that the payment order was issued by a person named on the account, the Bank may refuse to execute the payment order. You agree that payment orders received by the Bank are effective as your payment order, whether or not the order is actually authorized by you, if the Bank accepted the payment order in compliance with its security procedures.

**Confirmation Procedure:** The Bank is not obligated to provide you with next-day notice of the receipt of the funds. The Bank will provide you with notification of receipt in the next periodic statement. You agree to examine the periodic statement within 14 days after the statement is mailed and immediately notify the Bank of any discrepancy or error. If you fail to notify the Bank within 14 days after the statement is mailed you shall discharge and relieve the Bank from any liability of claims, demands or expenses (including attorney's fees) in connection with such discrepancy or error.

**Overdraft:** If a payment order is executed and creates an overdraft, with or without the Bank's prior consent, you agree to pay the Bank the overdraft plus any Overdraft Fee.

**Pre-Payment Disclosure and Receipt:** After each international transfer request and prior to payment, the Bank will immediately provide the consumer account holder with a Pre-payment Disclosure, providing the details of the consumer account holder's wire transfer request. The consumer account holder will be mailed a Receipt after payment has been made.

**Cancellation:** You cannot cancel or amend a domestic wire transfer request after it has been received by the Bank. You cannot cancel or amend an international wire transfer request after it has been received by the Bank unless you are a consumer account holder. Cancellation requests from consumer account holders for international wire transfers must be received by the Bank no later than 30 minutes after payment of the wire transfer is made. When the consumer account holder contacts the Bank, he or she must provide information to help the Bank identify the wire transfer he or she wishes to cancel, including the amount and location where the funds were sent. The Bank will refund the consumer account holder's money within three business days of his or her request to cancel the wire transfer unless the funds have already been picked up or deposited into the recipient's account.

**International Wire Transfer Error Resolution:** In case of an error or problem with a consumer account holder's international wire transfer request, the consumer account holder should, as soon as possible, notify the Bank via one of the following methods:
- ◆ Call the Bank at 888-833-3458 or contact the consumer account holder's local Bank branch; callers who are hearing or speech impaired should dial 711 or use a preferred Telecommunications Relay Service during customer service hours.

♦ Write the Bank at:
First Interstate Bank
401 North 31st Street
Billings, Montana 59101

♦ Fill out a Wire Transfer Dispute Form located at https://www.firstinterstatebank.com/applications/wire_transfer_dispute/

The consumer account holder must contact the Bank within 180 days of the date the Bank stated that funds would be made available to the recipient. Please provide the following when contacting the Bank:

    a. Consumer account holder's name and address (or telephone number);
    b. The error or problem with the transfer, and why the consumer account holder believes it is an error or problem and, if possible, the date of the error;
    c. The name of the person receiving the funds and, if possible, his or her telephone number or address;
    d. The dollar amount of the transfer; and,
    e. The confirmation code or number of the transaction.

The Bank will determine whether an error occurred within 90 days after the consumer account holder contacts the Bank. The Bank will tell the consumer account holder the results within three business days after completing the investigation. If the Bank decides that there was an error, the consumer account holder will be notified of the available remedies, and the Bank will correct the error promptly and in accordance with the remedy that the consumer selects. If the Bank decides that there was no error, the consumer account holder will be provided with a written explanation. The consumer account holder may ask for copies of any documents used in the investigation.

Governing Laws and Regulations: This Agreement is governed by the provisions of federal law, including Regulation J, 12 CFR Part 210, Subpart B and the appendices thereto, and the Electronic Fund Transfer Act and its implementing Regulation E, as applicable and to the extent that the payment order was carried out. Terms which are not defined in this Agreement shall have the same meanings as defined in Uniform Commercial Code Article 4A as adopted in the State of Montana. This Agreement is also subject to all applicable operating circulars of the Federal Reserve Bank in the District in which the Bank is located and any other applicable provision of federal or state law. To the extent that Regulation J does not apply, this Agreement is governed by the laws of the state of Montana.

## NOTICE OF NEGATIVE INFORMATION

Federal law requires us to provide the following notice to customers before any "negative information" may be furnished to a nationwide consumer reporting agency. "Negative information" includes information concerning delinquencies, overdrafts or any form of default. This notice does not mean that we will be reporting such information about you, only that we may report such information about customers that have not done what they are required to do under our agreement.
After providing this notice, additional negative information may be submitted without providing another notice.
We may report information about your account to credit bureaus. Late payments, missed payments or other defaults on your account may be reflected in your credit report.

## ELECTRONIC FUND TRANSFERS
## YOUR RIGHTS AND RESPONSIBILITIES

This Electronic Fund Transfer disclosure does not apply to any accounts other than consumer accounts, as defined by Regulation E.
Indicated below are types of Electronic Fund Transfers we are capable of handling, some of which may not apply to your account. Please read this disclosure carefully because it tells you your rights and obligations for the transactions listed. You should keep this notice for future reference.
Electronic Fund Transfers Initiated By Third Parties. You may authorize a third party to initiate electronic fund transfers between your account and the third party's account. These transfers to make or receive payment may be one-time occurrences or may recur as directed by you. These transfers may use the Automated Clearing House (ACH) or other payments network. Your authorization to the third party to make these transfers can occur in a number of ways. For example, your authorization to convert a check to an electronic fund transfer or to electronically pay a returned check charge can occur when a merchant provides you with notice and you go forward with the transaction (typically, at the point of purchase, a merchant will post a sign and print the notice on a receipt). In all cases, these third party transfers will require you to provide the third party with your account number and bank information. This information can be found on your check as well as on a deposit or withdrawal slip. Thus, you should only provide your bank and account information (whether over the phone, the Internet, or via some other method) to trusted third parties whom you have authorized to initiate these electronic fund transfers. Examples of these transfers include, but are not limited to:

♦ Preauthorized credits. You may make arrangements for certain direct deposits (such as U.S. Treasury (Social Security) or some employers (payroll)) to be accepted into your checking or savings account(s).
♦ Preauthorized payments. You may make arrangements to pay certain recurring bills from your checking or savings account(s).
♦ Electronic check conversion. You may authorize a merchant or other payee to make a one-time electronic payment from your checking account using information from your check to pay for purchases or pay bills.
♦ Electronic returned check charge. You may authorize a merchant or other payee to initiate an electronic funds transfer to collect a charge in the event a check is returned for insufficient funds.

Please also see Limitations on frequency of transfers section regarding limitations that apply to savings accounts.
Day & Night Telephone Banking - types of transfers - You may access your account by telephone 24 hours a day at 888-752-3341 using your personal identification number, a touch tone phone, and your account numbers, to:
♦ transfer funds from checking to checking or savings
♦ transfer funds from savings to checking or savings
♦ transfer funds from line of credit to checking or savings
Please also see Limitations on frequency of transfers section regarding limitations that apply to telephone transfers.
ATM Transfers - types of transfers and dollar limitations - You may access your account(s) by ATM, to:
♦ make deposits to checking or savings account(s)
♦ get cash withdrawals from checking or savings account(s)
  - you may withdraw no more than $300.00 per day using your ATM card and personal identification number, if there are sufficient funds in your account
  - you may withdraw no more than $1,000.00 per day using your debit card and personal identification number, if there are sufficient funds in your account
♦ transfer funds from savings to checking account(s)
♦ transfer funds from checking to savings account(s)
Mastercard® debit cardholders may not exceed $2,500.00 in transactions per day in combination with ATM withdrawals. Mastercard World cardholders may not exceed $5,000.00 in transactions per day in combination with ATM withdrawals.
Some of these services may not be available at all terminals.
In the event of security breach, fraud attempt, or other emergency, we may reduce, suspend, or cancel your ATM card limit without prior notice.
Please also see Limitations on frequency of transfers section regarding limitations that apply to ATM transfers.
Types of Debit Card Point-of-Sale Transactions - You may access your checking account(s) to purchase goods (in person, online, or by phone), pay for services (in person, online, or by phone), get cash from a merchant, if the merchant permits, or from a participating financial institution, and do anything that a participating merchant will accept.
Point-of-Sale Transactions - dollar limitations - Using your card:
♦ you may not exceed $2,500.00 in transactions per day, in combination with ATM withdrawals. This means the amount of transactions POSTED to your checking account each day cannot exceed $2,500.00.
In the event of security breach, fraud attempt, or other emergency, we may reduce, suspend, or cancel your debit card limit without prior notice.
Please also see Limitations on frequency of transfers section regarding limitations that apply to debit card transactions.
Currency Conversion and Cross-Border Transaction Fees. If you effect a transaction with your debit card in a currency other than US Dollars, Mastercard will convert the charge into a US Dollar amount. The Mastercard currency conversion procedure includes use of either a government-mandated exchange rate, or a wholesale exchange rate selected by Mastercard. The exchange rate Mastercard uses will be a rate in effect on the day the transaction is processed. This rate may differ from the rate in effect on the date of purchase or the date the transaction was posted to your account.
Mastercard charges us a Currency Conversion Assessment of 20 basis points (.2% of the transaction) for performing the currency conversion. In addition, Mastercard charges us an Issuer Cross-Border Assessment of 90 basis points (.9% of the transaction) on all cross-border transactions regardless of whether there is a currency conversion. As a result, we charge you a Currency Conversion fee of .2% and a Cross-Border Transaction fee of .9%. The Cross-Border Transaction fee is charged on all cross-border transactions regardless of whether there is a currency conversion. A cross-border transaction is a transaction processed through the Global Clearing Management System or the Mastercard Debit Switch in which the country of the merchant is different than the country of the cardholder.
Advisory Against Illegal Use. You agree not to use your card(s) for illegal gambling or other illegal purpose. Display of a payment card logo by, for example, an online merchant does not necessarily mean that transactions are lawful in all jurisdictions in which the cardholder may be located.
Please see your cardholder agreement for additional information relating to the use of your debit card.
Online Banking Computer Transfers/Mobile Banking Transfers - types of transfers - You may access your account(s) by logging onto our website or through the browser on your mobile phone to:
♦ transfer funds from checking to checking, savings, or certain loan account(s)

- transfer funds from savings to checking, savings, or certain loan account(s)
- transfer funds from line of credit to checking, savings, or certain loan account(s)
- deposit checks into a checking or savings account with an acceptable mobile phone
- transfer funds externally to a person using either their mobile phone number or email address
- transfer funds externally to an account you have at other financial institution using the account and routing number
- transfer funds from another financial institution to pay a First Interstate loan using the account and routing number

Please also see Limitations on frequency of transfers section regarding limitations that apply to computer transfers.

Bill Payment - types of transfers - You may access your account(s) by logging onto our website or through the browser on your mobile phone to:

- Use Bill Payment to make payments to individuals or companies to whom you want to send one-time or recurring payments from your checking account.

Please also see Limitations on frequency of transfers section regarding limitations that apply to Bill Payment transfers.

Bill Payment Fees and Charges: In addition to those fees and charges elsewhere described, if any, the following apply:

All Bill Payment users will be charged $.40 per payment in excess of 20 payments per calendar month

Limitations on frequency of transfers. In addition to those limitations on transfers elsewhere described, if any, the following limitations apply:

- Transfers from a money market account to another account or to third parties by preauthorized, automatic, telephone, or computer transfer or by check, draft, or similar order to third parties are limited to six per statement cycle.
- Transfers from a savings account to another account or to third parties by preauthorized, automatic, telephone, or computer transfer are limited to six per month with no transfers by check, debit card or similar order to third parties.

## FEES

Except as indicated elsewhere, we do not charge for electronic fund transfers. Please refer to our separate Fee Schedule for additional information about fees.

Wireless Carrier Fees. Your wireless carrier may assess message fees, data rates, and other charges when you use your mobile phone. Please refer to your contract with your wireless provider for information about these fees.

ATM Operator/Network Fees. When you use an ATM not owned by us, you may be charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer).

## DOCUMENTATION

- Terminal transfers. You can get a receipt at the time you make a transfer to or from your account using an automated teller machine or point-of-sale terminal. However, you may not get a receipt if the amount of the transfer is $15 or less.
- Preauthorized credits. If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at (855) 342-3400 to find out whether or not the deposit has been made.
- Periodic statements.

  You will get a monthly account statement from us for your checking accounts.

  You will get a monthly account statement from us for your savings accounts, unless there are no transfers in a particular month. In any case, you will get a statement at least quarterly.

## PREAUTHORIZED PAYMENTS

- Right to stop payment and procedure for doing so. If you have told us in advance to make regular payments out of your account, you can stop any of these payments. Here is how:

  Call or write us at the telephone number or address listed in this disclosure in time for us to receive your request 3 business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call.

  Please refer to our separate Fee Schedule for the amount we will charge you for each stop-payment order you give.

- Notice of varying amounts. If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be. (You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)
- Liability for failure to stop payment of preauthorized transfer. If you order us to stop one of these payments 3 business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

## FINANCIAL INSTITUTION'S LIABILITY

Liability for failure to make transfers. If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

(1) If, through no fault of ours, you do not have enough money in your account to make the transfer.
(2) If you have an overdraft line and the transfer would go over the credit limit.
(3) If the automated teller machine where you are making the transfer does not have enough cash.
(4) If the terminal or system was not working properly and you knew about the breakdown when you started the transfer.
(5) If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
(6) There may be other exceptions stated in our agreement with you.

## CONFIDENTIALITY

We will disclose information to third parties about your account or the transfers you make:

(1) where it is necessary for completing transfers; or
(2) in order to verify the existence and condition of your account for a third party, such as a credit bureau or merchant; or
(3) in order to comply with government agency or court orders; or
(4) as explained in the Privacy Disclosure contained elsewhere in this document.

## UNAUTHORIZED TRANSFERS

(a) Consumer liability.

- Generally. Tell us AT ONCE if you believe your card and/or code has been lost or stolen, or if you believe that an electronic fund transfer has been made without your permission using information from your check. Telephoning is the best way of keeping your possible losses down. You could lose all of the money in your account (plus your maximum overdraft line of credit). If you tell us within 2 business days after you learn of the loss or theft of your card and/or code, you can lose no more than $50 if someone used your card and/or code without your permission.

If you do NOT tell us within 2 business days after you learn of the loss or theft of your card and/or code, and we can prove we could have stopped someone from using your card and/or code without your permission if you had told us, you could lose as much as $500.

Also, if your statement shows transfers that you did not make, including those made by card, code or other means, tell us at once. If you do not tell us within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time.

If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

- Additional Limits on Liability for transactions with Debit Card and Registered Prepaid Mastercard Card. You will not be liable for any unauthorized transactions using your Debit Card and Registered Prepaid Mastercard Card if: (i) you can demonstrate that you have exercised reasonable care in safeguarding your card from the risk of loss or theft, and (ii) upon becoming aware of a loss or theft, you promptly report the loss or theft to us. This additional limit on liability does not apply to transactions on unregistered prepaid cards, such as gift cards.

(b) Contact in event of unauthorized transfer. If you believe your card and/or code has been lost or stolen, call or write us at the telephone number or address listed in this disclosure. You should also call the number or write to the address listed in this disclosure if you believe a transfer has been made using the information from your check without your permission.

## TERMINAL TRANSFERS

Transfers made by terminal may be executed immediately. This means that a cash withdrawal or other debit transaction is immediately deducted from your account (there is no float). Additionally, you may have no effective ability to stop a payment made by terminal transfer.

## ERROR RESOLUTION NOTICE

In Case of Errors or Questions About Your Electronic Transfers. Call or write us at the telephone number or address listed in this disclosure, as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent the FIRST statement on which the problem or error appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
(3) Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days (20 business days if the transfer involved a new account) after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days (90 days if the transfer involved a new account, a point-of-sale transaction, or a foreign-initiated transfer) to investigate your complaint or question. If we decide to do this, we will credit your account within 10 business days (20 business days if the transfer involved a new account) for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account. Your account is considered a new account for the first 30 days after the first deposit is made, unless each of you already has an established account with us before this account is opened.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation.

You may ask for copies of the documents that we used in our investigation.

FIRST INTERSTATE BANK
ATTN: ATM OPERATIONS
P.O. BOX 30918
BILLINGS, MONTANA 59116-0918
Business Days: Monday through Friday
Excluding Federal Holidays
Phone: (406) 237-2745 - 8:00 AM - 5:00 PM Mountain time.
Cash Card Network at 1-800-342-6599.
MORE DETAILED INFORMATION IS AVAILABLE ON REQUEST

NOTICE OF ATM/NIGHT DEPOSIT FACILITY USER PRECAUTIONS

As with all financial transactions, please exercise discretion when using an automated teller machine (ATM) or night deposit facility. For your own safety, be careful. The following suggestions may be helpful.

1. Prepare for your transactions at home (for instance, by filling out a deposit slip) to minimize your time at the ATM or night deposit facility.
2. Mark each transaction in your account record, but not while at the ATM or night deposit facility. Always save your ATM receipts. Don't leave them at the ATM or night deposit facility because they may contain important account information.
3. Compare your records with the account statements you receive.
4. Don't lend your ATM card to anyone.
5. Remember, do not leave your card at the ATM. Do not leave any documents at a night deposit facility.
6. Protect the secrecy of your Personal Identification Number (PIN). Protect your ATM card as though it were cash. Don't tell anyone your PIN. Don't give anyone information regarding your ATM card or PIN over the telephone. Never enter your PIN in any ATM that does not look genuine, has been modified, has a suspicious device attached, or is operating in a suspicious manner. Don't write your PIN where it can be discovered. For example, don't keep a note of your PIN in your wallet or purse.
7. Prevent others from seeing you enter your PIN by using your body to shield their view.
8. If you lose your ATM card or if it is stolen, promptly notify us. You should consult the other disclosures you have received about electronic fund transfers for additional information about what to do if your card is lost or stolen.
9. When you make a transaction, be aware of your surroundings. Look out for suspicious activity near the ATM or night deposit facility, particularly if it is after sunset. At night, be sure that the facility (including the parking area and walkways) is well lighted. Consider having someone accompany you when you use the facility, especially after sunset. If you observe any problem, go to another ATM or night deposit facility.
10. Don't accept assistance from anyone you don't know when using an ATM or night deposit facility.
11. If you notice anything suspicious or if any other problem arises after you have begun an ATM transaction, you may want to cancel the transaction, pocket your card and leave. You might consider using another ATM or coming back later.
12. Don't display your cash; pocket it as soon as the ATM transaction is completed and count the cash later when you are in the safety of your own car, home, or other secure surrounding.
13. At a drive-up facility, make sure all the car doors are locked and all of the windows are rolled up, except the driver's window. Keep the engine running and remain alert to your surroundings.
14. We want the ATM and night deposit facility to be safe and convenient for you. Therefore, please tell us if you know of any problem with a facility. For instance, let us know if a light is not working or there is any damage to a facility. Please report any suspicious activity or crimes to both the operator of the facility and the local law enforcement officials immediately.

## YOUR ABILITY TO WITHDRAW FUNDS

This policy statement applies to "transaction" accounts. Transaction accounts, in general, are accounts which permit an unlimited number of payments to third persons and an unlimited number of telephone and preauthorized transfers to other accounts of yours with us. Checking accounts are the most common transaction accounts. Feel free to ask us whether any of your other accounts might also be under this policy.

Our policy is to make funds from your cash deposits available to you on the same day as the deposit. Funds from check deposits are available on the next business day. Electronic direct deposits will be available on the day we receive the deposit. Once the funds are available, you can withdraw them in cash and we will use the funds to pay checks that you have written.

Please remember that even after we have made funds available to you, and you have withdrawn the funds, you are still responsible for checks you deposit that are returned to us unpaid and for any other problems involving your deposit.

For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays. If you make a deposit before 2:00 P.M. (cutoff times may be later on some days or at some locations) on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after 2:00 P.M. or on a day we are not open, we will consider that the deposit was made on the next business day we are open.

If you make a deposit at an ATM before 12:00 P.M. (cutoff times may be later on some days or at some locations) on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit at an ATM after 12:00 P.M. or on a day we are not open, we will consider that the deposit was made on the next business day we are open.

If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure for the type of check that you deposited.

### LONGER DELAYS MAY APPLY

Case-by-case delays. In some cases, we will not make all of the funds that you deposit by check available to you on the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $200 of your deposits, however, will be available on the first business day.

If we are not going to make all of the funds from your deposit available on the first business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the day after we receive your deposit.

If you will need the funds from a deposit right away, you should ask us when the funds will be available.

Safeguard exceptions. In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:

We believe a check you deposit will not be paid.

You deposit checks totaling more than $5,000 on any one day.

You redeposit a check that has been returned unpaid.

You have overdrawn your account repeatedly in the last six months.

There is an emergency, such as failure of computer or communications equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh business day after the day of your deposit.

### SPECIAL RULES FOR NEW ACCOUNTS

If you are a new customer, the following special rules may apply during the first 30 days your account is open.

Funds from electronic direct deposits to your account will be available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,000 of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over $5,000 will be available on the ninth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit.

Funds from on us check deposits will be available on the first business day after the day of your deposit.

Funds from check deposits will be available no later than the seventh business day after the day of your deposit.


**First Interstate** Bank

Rev. 3/19

© 2016 Wolters Kluwer Financial Services, Inc. All rights reserved AIB-P 6/1/2016 9a Custom TCM-28v,5,2Bbj,3o 201271377-010 EMTAIB9