# EXHIBIT 1

A. Clifford Edwards
Triel D. Culver
A. Christopher Edwards
John W. Edwards
EDWARDS & CULVER
1648 Poly Drive, Suite 206
Billings, Montana 59102
Telephone: (406) 256-8155
Facsimile: (406) 256-8159
triel@edwardslawfirm.org
chris@edwardslawfirm.org
john.edwards@edwardslawfirm.org

Jeffrey Kaliel, *pro hac vice* pending
Sophia Gold, *pro hac vice* pending
KALIEL PLLC
1875 Connecticut Avenue NW
10th Floor
Washington, DC 20009
(202) 300-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

*Attorneys for Plaintiff*

CLERK OF THE
DISTRICT COURT
TERRY HALPIN

2020 APR 10  A 9: 15

FILED

BY_____
DEPUTY 

## MONTANA THIRTEENTH JUDICIAL DISTRICT COURT
## YELLOWSTONE COUNTY, MONTANA

| | |
|---|---|
| BRANDY MORRIS, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>FIRST INTERSTATE BANK,<br><br>    Defendant. | Cause No. **DV 20-0528**<br><br>Judge: **Ashley Harada**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff, Brandy Morris, by counsel, and for her Class Action Complaint against the Defendant, she alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant, First Interstate Bank ("First Interstate"), arising from bank's routine practice of assessing and collecting "overdraft fees" ("OD Fees") on accounts that were never actually overdrawn.

2.      This practice breaches contract promises made in First Interstate's adhesion contracts.

3.      First Interstate's customers have been injured by First Interstate's improper practices to the tune of millions of dollars bilked from their accounts in violation of their agreements with First Interstate.

4.      On behalf of itself and the Class, Plaintiff seeks damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

## PARTIES AND JURISDICTION

5.      Plaintiff resides in Billings, Montana, and holds a First Interstate Bank checking account.

6.      Defendant First Interstate Bank is a Montana Bank engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Class. First Interstate has its headquarters in Billings, MT.  Its principal place of business is 401 North 31st Street, Billings, Montana 59101.

7.     This court has jurisdiction over Defendant pursuant to Rule 4, M.R.Civ.P., because First Interstate is a Montana bank subject to personal jurisdiction here, regularly conducts business here, and a substantial part of the conduct giving rise to the claims asserted herein occurred in Montana.

8.     Venue is proper here under MCA § 25-2-118 because Defendant resides in this County.

**FACTUAL ALLEGATIONS**

I.     **FIRST INTERSTATE CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT**

   A.     **Overview of Claim**

9.     Plaintiff has a checking account with First Interstate.

10.    First Interstate issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

11.    Pursuant to its standard account agreement, First Interstate charges fees (currently in the amount of $35) for debit card transactions that purportedly result in an overdraft.

12.    Plaintiff brings this cause of action challenging First Interstate's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

13.    Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, First Interstate immediately reduces accountholders' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient

3

available funds to cover these transactions because First Interstate has already sequestered these funds for payment.

14.   However, First Interstate still assesses crippling OD Fees on many of these transactions, and mispresents its practices in its account documents.

15.   Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, First Interstate later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

16.   First Interstate maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, First Interstate sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

17.   Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

4

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

18.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

19.     Still, despite keeping those held funds off-limits for other transactions, FIRST INTERSTATE improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

20.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the

5

disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

21.     There is no justification for these practices, other than to maximize First Interstate's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But First Interstate is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But First Interstate was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

22.     Besides being unfair and unjust, these practices breach contract promises made in First Interstate's adhesion contracts—contracts which fail to inform accountholders about the true nature of First Interstate's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

23.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that First Interstate will only charge OD Fees on transactions that have insufficient funds to "cover" that debit card transaction.

24.     In short, First Interstate is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

6

**B.**   **Mechanics of a Debit Card Transaction**

25.   A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from First Interstate. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to First Interstate, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

26.   At this step, if the transaction is approved, First Interstate immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

27.   Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

28.   First Interstate (like all credit unions and banks) decides whether to "pay" debit card transactions at authorization. After that, First Interstate is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when First Interstate may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

29.   There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

7

**C.     First Interstate Account Contract**

30.     Plaintiff has a First Interstate checking account, which is governed by First Interstate's standardized "Terms and Conditions of Your Account" document ("Deposit Agreement"), Ex. A.

31.     The Deposit Agreement expressly promises the available balance is immediately reduced for holds, including those placed immediately on debit card transactions; and confirms that "non-sufficient funds items" are only those items that "overdraw[] your account":

> **A temporary debit authorization hold affects your account balance** - On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Deposit Agreement, Ex. A at 3.

32.     The Deposit Agreement also provides that First Interstate makes overdraft determinations when it decides to "honor" transactions, which is the moment of authorization for debit card transactions:

> **Overdrafts** - You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the available account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account

8

regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts.

Deposit Agreement, Ex. A at 4.

33.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet First Interstate assesses OD Fees on them anyway.

34.     APPSN transactions are always *initiated* at the time the customer swipes the debit card when there are sufficient available funds in the account.

35.     In fact, First Interstate actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

36.     All the above representations and contractual promises are untrue. In fact, First Interstate charges OD Fees even when sufficient funds exist to cover`transactions that are authorized into a positive balance. No express language in any document states that First Interstate may impose OD Fees on any APPSN Transactions.

37.     The Deposit Agreement misconstrues First Interstates' true debit card processing and overdraft practices.

38.     First, and most fundamentally, First Interstate charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that First Interstate will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

9

39.     First Interstate assesses OD Fees on APPSN Transactions that *do* have sufficient funds available to cover them throughout their lifecycle.

40.     First Interstate's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between First Interstate's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

41.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

42.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what First Interstate does when it re-debits the account during a secret batching posting process.

43.     In reality, First Interstate's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

44.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, First Interstate cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

45.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, First Interstate does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, First Interstate releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

46.     This secret step allows First Interstate to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which First Interstate specifically set aside money to pay them.

47.     This discrepancy between First Interstate's actual practices and the contract causes accountholders to incur more OD Fees than they should.

48.     In sum, there is a huge gap between First Interstate's practices as described in the account documents and First Interstate's practices in reality.

**D.     First Interstate Abuses Contractual Discretion**

49.     First Interstate's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, First Interstate exploits contractual discretion to the detriment of accountholders when it uses these policies.

50.     The terms "hold" or "temporary hold" are interpreted by First Interstate in a surprising, counterintuitive way. First Interstate uses its discretion to define these terms in a manner contrary to any reasonable, common sense understanding of that term.

51.     Moreover, First Interstate uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

52.     First Interstate uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

**E.     Reasonable Accountholders Understand Debit Card Transactions are Debited Immediately**

53.     The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are

11

immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

54.    First Interstate was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

55.    First Interstate knows that many accountholders prefer debit cards for these very reasons. Research indicates that accountholders prefer debit cards as a budgeting device because they don't allow debt like credit cards do, and because the money comes directly out of a checking account.

56.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, ConsumerAction (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card.

57.    Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, ConsumerAction, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited August 29, 2019).

58.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

59.    Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

60.    First Interstate was aware of an accountholder perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated— and its account agreement only supports this perception.

**F.    Plaintiff's Debit Card Transactions**

61.    As examples, on March 6, 2017, March 7, 2017, and April 10, 2017 Plaintiff was assessed OD Fees for debit card transactions that settled on those days, despite the fact that positive funds were deducted immediately, prior to those days, for the transaction on which Plaintiff was assessed OD Fees.

**CLASS ACTION ALLEGATIONS**

62.    Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Montana Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

63.     Description of the Class: Plaintiff brings this class action on behalf of herself and a class of persons ("the Class") defined as follows:

> All citizens of the state of Montana who, during the applicable statute of limitations, were charged OD Fees on APPSN Transactions (the "Class").

64.     Excluded from the Class are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

65.     The time period for each of the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as First Interstate remedies the conduct complained of herein.

66.     Numerosity: The members of the proposed Class are so numerous that individual joinder of all members is impracticable. The exact number and identities of the members of the proposed Class are unknown at this time and can be ascertained only through appropriate discovery. Plaintiff estimate the number of members in each Class to be in the thousands.

67.     Common Questions of Law and Fact Predominate: There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include whether:

A.      Whether First Interstate charged OD Fees on items that did not overdraw checking accounts;

B.      Whether First Interstate breached its contract by charging OD Fees on items that did not overdraw checking accounts;

14

Case 1:21-cv-00076-SPW-TJC   Document 2-1   Filed 07/08/21   Page 16 of 21


C.     Whether First Interstate breached the covenant of good faith and faith dealing by charging OD Fees on items that did not overdraw checking accounts;

D.     Whether First Interstate developed and engaged in unlawful practices that mischaracterized or concealed its true OD Fee practices;

E.     The proper method or methods by which to measure damages; and

F.     The declaratory and injunctive relief to which the Class are entitled.

68.     Typicality: Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have been similarly affected by the actions of Defendant.

69.     Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex and consumer class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class, and has the financial resources to do so.

70.     Superiority of Class Action: Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all

15

class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the Class members.

71.     Risk of Inconsistent or Varying Adjudication: Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for First Interstate as the party opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

72.     Action Generally Applicable to Class as a Whole: First Interstate, as the party opposing the Class, has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract, Including the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Class)**

73.     Plaintiff incorporates by reference the preceding paragraphs.

74.     Plaintiff and First Interstate have contracted for banking services, as embodied in First Interstate's account documents and related documentation.

75.     All contracts entered by Plaintiff and the Class are identical or substantively identical because First Interstate's form contracts were used uniformly.

76.     First Interstate has breached the express terms of its own agreements as described herein when it assesses OD Fees on items that did not overdraw checking accounts.

77.     First Interstate has breached its contracts with Plaintiff and the Classes through its overdraft policies and practices alleged herein.

78.     Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the contracts.

79.     Plaintiff and members of the Class have sustained damages as a result of Defendant's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

80.     Plaintiff and members of the Class have no adequate remedy at law.

**COUNT II**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On Behalf of Plaintiff and the Class)**

81.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

82.     Defendant's Deposit Agreement is a contract of adhesion.

83.     Under the law of the state of Montana, good faith is an element of every contract. All contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

84.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of

17

the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

85.    A special relationship existed between Plaintiff/Class and First Interstate because, (1) the parties were in inherently unequal bargaining positions with First Interstate occupying the superior bargaining position, (2) the motivation for Plaintiff/Class entering into the contract was a consumer motivation, i.e., to make payments, secure peace of mind, security, and future protection of the deposit funds, (3) ordinary contract damages are not adequate because they do not require First Interstate to account for its actions and they do not make Plaintiff and the Class whole since they were exposed to ongoing emotional distress during the time it charged unauthorized fees, (4) Plaintiff and the Class are especially vulnerable because they have, by necessity, placed trust in First Interstate to fairly follow its banking policies and, (5) at all times, First Interstate knew Plaintiff and the Class were unsophisticated and in a vulnerable position because First Interstate was the author of the boilerplate Deposit Agreement and controlled the banking practices.

86.    First Interstate abused the discretion it granted to itself when it assessed OD Fees on items that did not overdraw checking accounts.

87.    In these and other ways, First Interstate violated the covenant of good faith and fair dealing.

88.    First Interstate willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing revenue from Plaintiff and other members of the Class.

89.    Each of First Interstate's actions was done in bad faith and was arbitrary and capricious.

90.     First Interstate's misconduct constitutes fraud and/or malice as defined by Montana law, MCA § 27-1-221, and entitling Plaintiff and the Class an award of punitive damages.

91.     Plaintiff and members of the putative Class have sustained damages as a result of each of First Interstate's breaches of the covenant of good faith and fair dealing.

**COUNT III**
**UNJUST ENRICHMENT**
**(In the Alternative to COUNT I)**
**(On Behalf of Plaintiff and the Class)**

92.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

93.     This Count is brought solely in the alternative to Plaintiff's breach of contract and breach of the covenant of good faith and fair dealing claims.  Plaintiff acknowledges that her breach of contract claim cannot be tried along with unjust enrichment.

94.     To the detriment of Plaintiff and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

95.     Plaintiff and the Class conferred a benefit on Defendant when they paid Defendant the fees that were not disclosed or allowed for in the in the Account Documents.

96.     Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

97.     Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

98.     Plaintiff and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff on her own behalf and on behalf of the Class respectfully request that the Court:

(a)    Certify this case as a class action pursuant to Rule 23, appointing Plaintiff as class representative and appointing counsel for Plaintiff as lead counsel for the Class;

(b)    Award Plaintiff and the Class actual, incidental, statutory, and consequential damages in an amount to be proven at trial, including any and all compensatory damages, punitive damages under MCA § 27-1-220, restitution, any applicable penalties and interest, authorized attorneys' fees, interest, and costs, and any further relief as the Court deems just equitable, and proper;

(c)    Declare First Interstate's practices outlined herein to be unlawful;

(d)    Enjoin First Interstate from engaging in the practices outlined herein;

(e)    Compelling disgorgement of the ill-gotten gains derived from First Interstate's misconduct;

(f)    Grant Plaintiff and the Class a trial by jury; and

(g)    Awarding such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

DATED this 10th day of April, 2020.

EDWARDS & CULVER

By:_____

A. Clifford Edwards
Triel D. Culver
A. Christopher Edwards
John W. Edwards
*Attorneys for Plaintiff*

20